UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| NATIONAL ASSOCIATION OF SYSTEM | ) | |
| ADMINISTRATORS, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-159-SEB-JMS |
| | ) | |
| AVIONICS SOLUTIONS, INC. and TODD | ) | |
| THOMASSEN, individually, | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH
TRIAL**

This matter came before the Court for a bench trial on October 22-23, 2007, to
resolve Plaintiff's, the National Association of System Administrators, Inc. ("Systems
Administrators"), claim that Defendants, Avionics Solutions, Inc. ("Avionics Solutions")
and Todd Thomassen (Avionics Solutions's sole shareholder), breached a contract to
repair Systems Administrators's Cessna 310 airplane.  Systems Administrators contends
that Avionics Solutions's corporate veil should be pierced, thereby making Mr.
Thomassen personally liable for any damages the Court may award in its favor.  Mr.
Thomassen admits that the repair contract was breached, but claims that he entered into
the contract on behalf of his corporation, Avionics Solutions, and not in his personal
capacity, so the corporate veil should not be pierced.  However, in the event that he is
found personally liable, Mr. Thomassen asserts an affirmative defense that any debt he
might be found responsible for was discharged in his Chapter 7, no-asset bankruptcy.  Mr.

Thomassen has also brought a counterclaim against Systems Administrators for storage fees generated during the period of time the airplane was housed in the hangar he had rented.  For the reasons discussed below, we find Defendant Avionics Solutions LIABLE to Plaintiff Systems Administrators in the amount of $47,823.35.  We also conclude that Avionics Solutions's corporate veil should be pierced, thereby making Mr. Thomassen personally liable for his corporation's debt.  However, as further explained in this ruling, we hold that Mr. Thomassen's debt was discharged as a result of his Chapter 7, no-asset bankruptcy, even though Systems Administrators was never listed as a creditor on his petition.  Additionally, we rule that Plaintiff Systems Administrators is NOT LIABLE for storage fees.

## Findings of Fact

### I.     General Background

The business engaged in by Systems Administrators is that of providing support and maintenance for corporate data storage systems to customers throughout the United States.  In order to provide timely and efficient service to its customers, it uses its own aircraft to fly its employees to its customers' locations.  In May 2003, Systems Administrators purchased the aircraft at the center of this dispute – a twin engine Cessna 310 ("Cessna"), FAA Registration Number 336J – for $127,000.  At the time it acquired the Cessna, Systems Administrators already owned a single engine Piper Cherokee ("Piper") airplane and a twin engine Beechcraft Duke ("Duke"), but it purchased the

Cessna because it was safer than the single engine Piper, and had significantly lower operating and maintenance costs and better fuel efficiency than the Duke. Joanne Blanchard, Systems Administrators's Chief Financial Officer, testified that Systems Administrators intended to utilize the Cessna four to five hours per week in conducting its business.

Shortly after Systems Administrators acquired the Cessna, on June 12, 2002, the aircraft was damaged in a landing accident in Champaign, Illinois. The pin supporting the nose wheel collapsed, causing damage to the engines, propellers, nose landing gear, sheet metal on the nose, and the nosecone. The engines and propellers were repaired by Flightstar, Inc. in Savoy, Illinois, but in order to repair the nosecone and landing gear properly, the Cessna had to be taken elsewhere. Systems Administrators's pilot recommended the Cessna be taken for repair to Gazelle/USA Charter ("Gazelle"), an aircraft service and repair company located at the Monroe County Airport in Bloomington, Indiana. Gazelle agreed to undertake the repairs necessitated by the accident, which included the repair and replacement of body panels on the nose and front landing gear doors, as well as installing "stiffening kits" to the wings to provide additional support for the landing gear, which was a modification unrelated to the accident.

The total estimated cost for the repairs was $13,484.79, which included $2,500.00 in labor costs and $10,984.00 for parts. Gazelle performed certain repairs, for which it provided Systems Administrators with time sheets covering the work performed by its

mechanics and two invoices, one dated August 31, 2002, and the other, February 20, 2003, for $2,112.50 and $1,365.00, respectively.  Additionally, Gazelle purchased parts for the Cessna at a total cost of $10,984.00, for which Systems Administrators paid on January 1, 2003.

In late February 2003, Mr. Thomassen contacted Systems Administrators to advise that Gazelle was about to go out of business because of financial problems and that the Cessna should be moved from Gazelle's hangar before Gazelle's creditors took possession of its property.  Mr. Thomassen had begun working as an aircraft mechanic in 1991, was licensed by the Federal Aviation Administration ("FAA"), and was familiar with System Administrator's Cessna, having seen it from time to time in the course of his employment elsewhere at Monroe County Airport.  Mr. Thomassen also had worked as a consultant for Gazelle in the spring of 2002, while employed with Indianaero, Inc. ("Indianaero"), and had completed maintenance and repair work on various other Cessna 310's throughout his tenure there.  By the time Mr. Thomassen contacted Systems Administrators, Indianaero had also closed up its business, after which Mr. Thomassen formed his own business and became the sole shareholder and president of Avionics Solutions, a fledgling corporation in the business of aircraft maintenance and repair. During Mr. Thomassen's conversation with Systems Administrators near the end of February 2003, he offered to perform the necessary repairs, whereupon it was agreed that the Cessna would be moved to Mr. Thomassen's hangar and that the repair work would proceed under his supervision.

4

Gazelle went out of business before completing the repairs on the Cessna, but released the Cessna to Mr. Thomassen on February 27, 2003, agreeing to provide to him the parts that Systems Administrators had paid for which Gazelle had purchased for the aircraft.  Intermittent communications ensued between Mr. Thomassen, Ms. Blanchard, and other representatives from Systems Administrators and on March 24, 2003, Mr. Thomassen conducted a preliminary inspection of the Cessna, assessing the work that had been completed by Gazelle and preparing an initial summary, which he personally signed on Indianaero letterhead and sent to Systems Administrators.  A few days later, on April 1, 2003, Mr. Thomassen sent Systems Administrators a more detailed description of the Cessna's condition along with his estimate of the total cost of the repairs in the amount of $49,588.55.  This second document was on plain letterhead and signed by Mr. Thomassen in his individual capacity.

Mr. Thomassen next made contact with Systems Administrators in another document utilizing Avionics Solutions letterhead and dated May 11, 2003, which he again signed in his personal capacity.  In this letter, Mr. Thomassen informed Systems Administrators that he had ordered some of the required replacement parts, and that he intended to order the remainder of the parts as soon as possible.  Mr. Thomassen also expressed his desire to have all unresolved matters between Systems Administrators and Gazelle finalized before he began working on the Cessna in order to maintain the aircraft's then current condition thus facilitating the bringing of Systems Administrators's claims against Gazelle for poor workmanship and loss of use.  The parts purchased by

Gazelle had at this point still not been delivered by Gazelle to Mr. Thomassen.

On January 11, 2004, Mr. Thomassen sent another letter to Systems Administrators requesting authorization to begin work on the Cessna and referencing the amount of storage fees that had accrued while they were waiting for the parts from Gazelle. This was the first mention that storage fees would be imposed by Mr. Thomassen, since previously he had informed Systems Administrators that he did not charge storage fees for airplanes Avionics Solutions was repairing. Subsequent to the January 11th letter, however, Mr. Thomassen never invoiced Systems Administrators for any storage fees. On January 22, 2004, Mr. Thomassen again requested authorization to begin repairs, which Ms. Blanchard, on behalf of Systems Administrators, provided. In that fax transmission, Mr. Thomassen wrote that he hoped to have the repairs well underway, if not completed, before the busy flying season in the spring (of 2004).

Not until February 20, 2004, did Mr. Thomassen receive the parts from Gazelle. Mr. Thomassen and attorneys representing System Administrators in its lawsuit against Gazelle met on April 21, 2004, to inventory the parts. On May 17, 2004, Mr. Thomassen summarized in a letter to Ms. Blanchard the condition of the parts that had finally arrived. According to Mr. Thomassen's report, some of the parts had been damaged, one was defective, and all were missing FAA worthiness approval tags. Despite these defects, Mr. Thomassen testified that, throughout the time he had possession of the Cessna, he performed various repairs on the aircraft, including cleaning the corroded parts, cutting the parts down to the proper size, and drilling additional holes in various parts in order to

6

fit them to the Cessna.  However, many of the parts that he prepared for attachment were never actually riveted to the aircraft.

As mentioned above, in January, Mr. Thomassen initially told Systems Administrators that he planned to have the repairs substantially completed by the spring of 2004.  Again, in May 2004, Mr. Thomassen represented to Systems Administrators that all repairs would be completed within another approximately two and a half months. When that deadline passed, Mr. Thomassen informed Systems Administrators that the repair work would be completed by October 2004.  Throughout this time, Mr. Thomassen intermittently informed Systems Administrators that work on the Cessna was progressing well.  Finally, after many more months of waiting, Systems Administrators imposed a completion deadline of August 5, 2005, which it subsequently agreed to extend one more time to September 6, 2005.

Though Mr. Thomassen retained possession of the Cessna through the end of September 2005, the repairs were never completed.  In fact, the aircraft remained in essentially the same condition throughout these many months as when Mr. Thomassen first acquired possession of it.  Systems Administrators finally regained possession of the still unrepaired Cessna on September 28, 2005, and requested from Mr. Thomassen an itemization of hours and work performed by him on the Cessna, but he never produced any records of the work he had performed.  To date, Systems Administrators has been unable to find a mechanic willing to complete the repairs necessary to return the Cessna to an airworthy condition.

7

## II.     Financial Details

Although Mr. Thomassen gave Systems Administrators an initial estimate of the cost of the anticipated repairs, the parties never agreed on a specific payment arrangement during those discussions.  On May 27, 2004, Mr. Thomassen first contacted Systems Administrators regarding payments, informing Systems Administrators that he required a down payment before he would begin work on the Cessna, but he did not lay out any specific payment schedule.  Accordingly, based upon Mr. Thomassen's representation that the work would take approximately three months to complete, Systems Administrators put together a payment plan on the basis of which it made an initial payment to Avionics Solutions on June 1, 2004, covering invoices dated March 4, 2003, and May 13, 2003, in the amounts of $2,303.50 and $1,680.00, respectively, for Mr. Thomassen's consulting fees, the transport of the Cessna from Gazelle's hangar to the hangar leased by Mr. Thomassen, and the repair estimate.  On that same day, Systems Administrators also made an initial payment toward the repairs, in the amount of $8,516.50.  Five more payments were made by Systems Administrators to Mr. Thomassen at regular intervals, through August 14, 2004, when $47,823.35, the total amount agreed upon to complete the job, had been paid to Avionics Solutions.

Beginning on June 10, 2004, Mr. Thomassen, who, as noted above, was the president and sole shareholder of Avionics Solutions, wrote checks from Avionics Solutions's bank accounts to himself in substantial and rounded amounts, ranging from $500.00 to $5,000.00.  None of these checks included a notation to indicate what the

8

money was for.  These withdrawals by Mr. Thomassen from Avionics Solutions's account occurred anywhere from two to six times per month, through January 12, 2005. The deposits into his personal bank account often coincided with a withdrawal later on that same day for a personal expense, such as a mortgage payment.  Between June and January 2005, Mr. Thomassen made twenty-seven such transfers, totaling $48,400.00.[1] Mr. Thomassen testified that when the corporation needed additional funds to purchase a piece of equipment or a repair tool or part, he would shift money from his personal account into the corporate account to replenish the latter.  Additionally, throughout this time, because Mr. Thomassen was unable to obtain a business credit card, he used his personal credit card for business expenses and then reimbursed himself from the corporate account.

In an effort to recoup its lost investment in the repairs of the Cessna which were never performed and its loss of use of the aircraft during the time it was in the possession of Mr. Thomassen, Systems Administrators initiated this litigation by filing its Complaint on January 27, 2006.

## Conclusions of Law

### I.      Damages

---

[1] Not until March 2005 did Mr. Thomassen begin to draw checks from Avionics Solutions to himself and his wife in a more routine fashion, indicating on the "memo" line of the checks that the funds were for "wages" or "payroll."

**A.      Breach of Contract**

There is no dispute regarding whether the contract to repair the aircraft was breached.  Both parties agree that it was.  Thus, we proceed directly to a discussion of damages.  Under Indiana law, "[a] party injured by a breach of contract is limited in his or her recovery to the loss actually suffered, and he or she may not be placed in a better position than the party would have enjoyed had the breach not occurred."  Crider & Crider, Inc. v. Downen, 873 N.E.2d 1115, 1118 (Ind. Ct. App. 2007) (citing Abbey Villas Dev. Corp. v. Site Contractors, Inc., 716 N.E.2d 91, 101 (Ind. Ct. App. 1999)).  Actual damages include reasonable expenses that are a natural consequence of the breach. Merrillville Conservancy Dist. v. Atlas Excavating, Inc., 764 N.E.2d 718, 724 (Ind. Ct. App. 2002) (citing A.B.C. Home & Real Estate Inspection, Inc. v. Plummer, 500 N.E.2d 1257, 1263 (Ind. Ct. App. 1986)).  However, damages must be supported by evidence in the record and proven with reasonable certainty; they may not be awarded solely on the basis of conjecture or speculation.  R&R Real Estate Co., LLC v. C&N Armstrong Farms, Ltd., 854 N.E.2d 365, 370-71 (Ind. Ct. App. 2006) (citations omitted).

It is undisputed that Systems Administrators paid Avionics Solutions a total of $47,823.35 to completely repair its aircraft.  Although Mr. Thomassen testified at length regarding various tasks that he claims he did complete on the Cessna, the majority of that work was preparatory.[2]  Both parties agree that the repairs contracted for were not

---

[2] For example, Mr. Thomassen testified that he cleaned many of the parts because they
(continued...)

finished and that the aircraft remains in an unairworthy condition.  Thus, because the agreement between them was for the complete repair of the aircraft and the Cessna even today remains largely in the same condition it was when the parties entered into their contract, Systems Administrators is entitled to recover the entire amount it paid Avionics Solutions to complete the repairs.[3]  Therefore, we find that Avionics Solutions is <u>LIABLE</u> to Systems Administrators in the amount of $47,823.35.


### B.      Loss of Use

Systems Administrators also seeks to recover for its loss of use of the aircraft.  In cases where there is a long and unreasonable delay in performing contractual obligations, damages for loss of use of the property to be repaired may be awarded in some circumstances.  <u>Johnson-Johnson, Inc. v. Farah</u>, 108 N.E.2d 638, 639 (Ind. Ct. App. 1952) (discussing breach of a construction contract).  Here, in light of the fact that Mr. Thomassen never performed his contractual obligations and was in possession of the aircraft for over two years, despite his periodic assurances to Systems Administrators that he was working to get it repaired, it is obvious that there has been an exceedingly long

---

[2](...continued)
were corroded, cut the parts down to size, and drilled additional holes into various parts in order to fit them to the Cessna.  However, as mentioned above, most of those parts were never actually riveted onto the aircraft.

[3] Mr. Thomassen did not bring a claim under a theory of quantum meruit for the value of the work that he did do to attempt to retain any portion of the money Systems Administrators paid him to complete the repairs.

period of delay.  The time consumed related to Systems Administrators's lawsuit against Gazelle and the difficulties Mr. Thomassen experienced associated with retrieving the parts that had been retained by Gazelle makes it unclear whether Mr. Thomassen is solely responsible for the entire delay.

In any event, Systems Administrators did not produce sufficient evidence to prove the amount of damages it incurred as a result of its loss of use claim.  Throughout the period in which Systems Administrators was unable to use the Cessna, it also owned two other planes – the Piper and the Duke – and had in its employ only one pilot.  Systems Administrators did present evidence regarding the additional expense associated with flying the Duke, but it provided no information regarding the cost of flying the Piper to explain why it could not have utilized the Piper, if that were the case.  Systems Administrators also did not develop any evidentiary extrapolation (beyond an estimation of four hours per week that it planned to use the Cessna) to demonstrate the number of times it actually used the Duke or the Piper in place of the Cessna.  In sum, Systems Administrators did not satisfy its burden to prove, by a preponderance of the evidence, loss of use damages to a reasonable degree of certainty.  Therefore, we find that Avionics Solutions is <u>NOT</u> <u>LIABLE</u> to Systems Administrators for damages for loss of use of the Cessna.

**C.      Conversion**

We address this issue in detail in our discussion regarding the bankruptcy

12

discharge below.  For the reasons explicated *infra*, we hold that Avionics Solutions is

NOT LIABLE on a theory of conversion in this case.


## II.     Piercing the Corporate Veil

Generally, Indiana courts are reluctant to disregard corporate identity to hold an

individual personally liable for business-related damages.  Lambert v. Farmers Bank, 519

N.E.2d 745, 747 (Ind. Ct. App.1988).  However, personal liability will be imposed when

necessary to "protect innocent third parties from fraud or injustice."  Aronson v. Price,

644 N.E.2d 864, 867 (Ind. 1994).  When exercising its equitable power to pierce the

corporate veil, the court engages in a highly fact-sensitive inquiry.  Winkler v. V.G. Reed

& Sons, Inc., 638 N.E.2d 1228, 1232 (Ind. 1994).  The party seeking to pierce the

corporate veil has the burden to prove by a preponderance of the evidence that "the

corporate form was so ignored, controlled or manipulated that it was merely the

instrumentality of another and that the misuse of the corporate form would constitute a

fraud or promote injustice."  Id. (citing Winkler, 638 N.E.2d at 1232 (quoting Gurnick v.

Lee, 587 N.E.2d 706, 710 (Ind. Ct. App. 1992)); see also Escobedo v. BHM Health

Assoc., Inc., 818 N.E.2d 930, 933 (Ind. 2004).

When determining whether the party requesting that the corporate veil be pierced

has met its burden, Indiana courts consider whether the party has presented evidence

demonstrating: (1) undercapitalization; (2) absence of corporate records; (3) fraudulent

representation by corporation shareholders or directors; (4) use of the corporation to

promote fraud, injustice, or illegal activities; (5) payment by the corporation of individual

obligations; (6) commingling of assets and affairs; (7) failure to observe required

corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or

manipulating the corporate form.  Community Care Centers, Inc. v. Hamilton, 774 N.E.2d

559, 565 (Ind. Ct. App. 2002) (citing Smith v. McLeod Distrib. Inc., 744 N.E.2d 459, 463

(Ind. Ct. App. 2000)).  Therefore, "as a general statement, the factors to be considered

include whether the corporate form has been adhered to, whether corporate assets are

treated as such or as personal assets, and whether there has been an attempt to deceive a

third party."  Winkler, 638 N.E.2d at 1232.

Certain of these factors are clearly self-explanatory and thus have not required

elaboration in the caselaw, but others have required a fleshing out through decisions

handed down by Indiana courts.  The first factor, "inadequate capitalization," has been

defined by Indiana courts as "capitalization very small in relation to the nature of the

business of the corporation and the risks attendant to such business."  Community Care

Centers, 774 N.E.2d at 565 (quoting 1 WILLIAM MEADE FLETCHER, FLETCHER

CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 41.33 at 652 (perm. ed. 1999)).

The adequacy of capital is measured solely by evaluating the amount of capital the

corporation had at the time it was formed, unless the corporation at some point

substantially expanded the size or nature of its business, accompanied by an increase in

business hazards.  774 N.E.2d at 565 (citing FLETCHER, at 652-53).  When evaluating this

factor, a court looks only at the adequacy of capitalization during a period outside of the

14

corporation's inception if there has been some such change since its inception.

Here, no direct evidence was presented regarding the amount of paid-in capital to Avionics Solutions at its inception.  Mr. Thomassen reportedly solicited Systems Administrators's business in February 2003, very shortly after Avionics Solutions was incorporated, and he testified that at that point Avionics Solutions had contracted to do at least a few other repair jobs in addition to the agreement he had entered into with Systems Administrators.  Nonetheless, Mr. Thomassen required Systems Administrators to make a down payment to enable him to purchase the parts needed for the repairs.  Additionally, evidence disclosed that Mr. Thomassen had difficulty paying various other corporate expenses, including rent on the hangar he had leased.  Thus, without the advance payment, Avionics Solutions lacked sufficient capital, even after performing other repair jobs, to purchase the parts necessary to complete the repair work for Systems Administrators or keep up with its other expenses.  Because the airplane repair business is, by nature, both expensive and complex, we conclude that Avionics Solutions was not adequately capitalized when incorporated, considering that it did not have sufficient financial resources available almost immediately after it was formed to pay its ordinary, ongoing corporate expenses, including purchasing parts for the Cessna it had contracted to repair, without first receiving a down-payment from Systems Administrators.

The elements of payment by the corporation of personal obligations and commingling of assets and affairs overlap in some ways, but together basically require that the corporation be operated as its own business unit, separate and distinct from an

15

individual shareholder's personal affairs.  <u>Community Care Centers</u>, 774 N.E.2d at 569

(citing FLETCHER § 41.50 at 677).  Thus, for example, evidence of an individual using

corporate funds for personal purposes, failing to keep corporate and personal accounts

separate, or combining assets so that ownership interests are indistinguishable must be

weighed when determining whether piercing the corporate veil is warranted.  <u>Id.</u> (citing

FLETCHER at 677-78).  The evidence here established that Mr. Thomassen did not keep

his corporate and personal assets separate.  As described above, Mr. Thomassen funneled

corporate assets into his personal accounts almost immediately after he received them,

often using the money to pay such personal expenses as his mortgage.  Mr. Thomassen

also testified that at times he transferred personal funds to corporate purposes, using a

personal credit card for business expenses and personal funds to replenish his corporate

accounts as necessary.  In short, Mr. Thomassen did not maintain Avionics Solutions as a

distinct corporate entity; rather, he treated Avionics Solutions as a conduit for his

personal business affairs, through an ongoing process of "borrowing from Peter to pay

Paul" (and vice versa).

Proper adherence to corporate formalities is another important factor in this

analysis.  For the purpose of determining whether the corporate veil should be pierced,

corporate formalities include "proper corporate filings, the issuance of stock, election of

directors and officers, shareholders and directors meetings, resolutions authorizing

payments and corporate minutes."  <u>Aronson</u>, 644 N.E.2d at 868.  Failure to adhere to

corporate formalities "can provide circumstantial evidence of shareholder abuse and

shareholder use of the corporation as a conduit for personal affairs."  Id.

Here, Mr. Thomassen was the sole shareholder of Avionics Solutions, and was responsible for all the corporate affairs.  Yet, he failed to keep virtually any business records whatsoever.  He kept no record of the time that Avionics Solutions spent making repairs to the Cessna; he failed to log any of the work that Avionics Solutions performed on the aircraft; and he did not issue invoices to Systems Administrators for labor or most of the parts he claims he purchased.  Additionally, throughout his dealings with Systems Administrators, Mr. Thomassen transacted business in ways that made it unclear whether he was acting in his personal capacity or as a representative of Avionics Solutions.  He signed documents in his individual capacity, often failed to use his company's letterhead, and consistently used the personal pronoun "I" when discussing work that was going to be performed on the aircraft, which created confusion concerning the entity with whom Systems Administrators was actually dealing.

As mentioned above, Indiana courts consider whether the disregard of the corporate form amounted to fraud or promoted injustice in deciding whether to pierce the corporate veil.  Thus, there is often some kind of dishonesty or deceit involved in corporate veil piercing cases.  However, "[e]ven absent illegitimate purposes," in order to receive recognition of corporateness, the business must (1) be conducted on a corporate and not a personal basis and (2) have adequate financial resources because "[t]he shareholder who refuses to draw a line between his individual and corporate affairs is in a poor position to ask that the court effect what he has failed to do."  State v. McKinney,

508 N.E.2d 1319, 1321 (Ind. Ct. App. 1987) (quoting H. HENN, HANDBOOK OF THE LAW

OF CORPORATIONS § 147, at 256-57 (West 1970)).  Clearly, Mr. Thomassen did not

perform in either way in operating Avionics Solutions.  Because Mr. Thomassen himself

failed to maintain the necessary separateness between Avionics Solutions and his own

affairs in his dealings with Systems Administrators, we likewise decline to do so in his

stead here.  There is more than ample justification to pierce the corporate veil under these

circumstances, the consequences of which exposes Mr. Thomassen to personal liability

for any damages assessed against Avionics Solutions in favor of Systems Administrators.


**III.     Affirmative Defense of Discharge in Bankruptcy**

Mr. Thomassen filed for Chapter 7 bankruptcy in February 2005, and the discharge

order was issued on May 16, 2005.  In his answer to Systems Administrators's complaint,

Mr. Thomassen raised the affirmative defense of his discharge in bankruptcy, claiming

that any debt he may be found liable for was discharged in that proceeding.  However, in

his bankruptcy petition, he failed to include Systems Administrators as a creditor because,

according to his testimony, at the time he filed for bankruptcy, he was still planning to

finish the repair work that he had contracted to perform for Systems Administrators.

Systems Administrators claims that because this debt was not included and Systems

Administrators was not listed as a creditor, the debt was not discharged.  Mr. Thomassen

rejoins that, because his was a no-asset bankruptcy, Systems Administrators was not

18

prejudiced by his failure to list it on his bankruptcy schedule, and thus, his debt to Systems Administrators was discharged because it did not meet any of the exceptions to discharge provided for in 11 U.S.C. § 523(a).

### A.      General Overview of Bankruptcy Procedure

A discharge under Chapter 7 discharges all debts that arose before the date of the order for relief, *except as provided in* 11 U.S.C. § 523. <u>See</u> 11 U.S.C. § 727(b) (emphasis added).  Section 523(a) lists nineteen bases for nondischargeability and § 523(a)(3) references the dischargeability of unscheduled debts.  Generally, if a debt is not listed or scheduled, as was the case with the one here, it will *not* be discharged in bankruptcy, *unless* the creditor has notice or actual knowledge of the bankruptcy filing in order to timely file a proof of claim or, in limited cases, to make a timely request for a determination of dischargeability.[4]  11 U.S.C. § 523(a)(3).  This rule is in place to protect a creditor's right to file a claim and be included in the bankruptcy resolution.  <u>Stark v. St. Mary's Hospital</u>, 717 F.2d 322, 324 (7th Cir. 1983).  However, under Rule 2002(e) of the Federal Rules of Bankruptcy Procedure,[5] in a no-asset bankruptcy such as Mr.

---

[4] Creditors are required to make a timely request for a determination of dischargeability for certain types of debts, including those defined in § 523(a)(2), § 523(a)(4), and § 523(a)(6).  These are discussed in greater detail below.

[5] Rule 2002(e) provides that "[i]n a chapter 7 liquidation case, if it appears from the schedules that there are no assets from which a dividend can be paid, the notice of the meeting of creditors may include a statement to that effect; that it is unnecessary to file claims; and that if sufficient assets become available for the payment of a dividend, further notice will be given for

(continued...)

Thomassen's, creditors are notified that there is no need to file a claim, since no distribution will be made.  Consequently, in the ordinary case, no prejudice accrues to an unlisted creditor in a no-asset bankruptcy since there would have been no distribution even if the debt had been scheduled; thus, notice of the bankruptcy to permit the filing of a claim is unnecessary.  In a no-asset bankruptcy, many courts, including this district, hold that a debt is discharged even if it is not listed. E.g., Lucas v. Wilson, Case No. 96-92041-BHL-7, Adversary Proceeding No. 00-9029, at 6 (Bankr. S.D. Ind. 2000) (Lorch, J.) ("[T]his Court joins with the majority of courts that have found that unscheduled debts, not otherwise excepted from discharge by virtue of 523(a)(2), (a)(4) or (a)(6),[6] are discharged in a no-asset Chapter 7 bankruptcy.").

However, consistent with the view taken by Judge Lorch in Lucas, *supra*, this discharge applies only when the debt is *not* of the kind described in 11 U.S.C. § 523(a)(2), § 523(a)(4), or § 523(a)(6).[7]  The creditor must make a timely request for a determination of dischargeability of such a debt.  11 U.S.C. § 523(a)(3)(B).  For such a

---

[5](...continued)
the filing of claims."

[6] These exceptions are discussed below.

[7] These include, inter alia, any debt: (1) "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition," 11 U.S.C. § 523(a)(2)(A); (2) "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny," 11 U.S.C. § 523(a)(4); or (3) "for willful and malicious injury by the debtor to another entity or to the property of another entity," 11 U.S.C. § 523(a)(6).

request to be "timely," it must be brought by way of complaint filed with the bankruptcy

court no later than sixty days after the first date set for the meeting of creditors.  See Fed.

R. Bankr. Proc. 4007(c).  Therefore, pursuant to § 523(a)(3)(B),[8] if one of these types of

debts was not listed or scheduled in time to permit a timely request for a determination of

dischargeability and the creditor had no notice or actual knowledge of the case in time to

do so, it will not be discharged because the creditor was prejudiced.[9]  Thus, in light of

Judge Lorch's opinion, Systems Administrator's debt should be discharged by Mr.

Thomassen's no-asset bankruptcy filing, even though it was not listed or scheduled,

*unless* it satisfies one of the § 523(a) exceptions.[10]

---

[8] 11 U.S.C. § 523(a)(3)(B) provides that: "(a) A discharge under section 727, 1141,
1228[a] 1228 [b], or 1328(b) of this title does not discharge an individual debtor from any debt
(3) neither listed nor scheduled under section 521(1) of this title, with the name, if known to the
debtor, of the creditor to whom such debt is owed, in time to permit (B) if such is of a kind
specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and
timely request for a determination of dischargeability of such debt under one of such paragraphs
unless creditor had notice or actual knowledge of the case in time for such timely filing and
request."

[9] We are not aware of the original date set for the meeting of the creditors in this case,
knowledge of which would allow us to determine when the sixty days for a "timely" request
began to run.  However, Systems Administrators was not listed as a creditor on Mr. Thomassen's
bankruptcy schedule and thus did not find out about the May 16, 2005, bankruptcy discharge
order until Mr. Thomassen's answer to this complaint was filed on May 10, 2006, nearly a year
later.  Additionally, Mr. Thomassen admits that his debt is nondischargeable, if it falls within
one of the § 523(a) exceptions.  Thus, we conclude that the sixty-day window has expired, and
since this debt was never listed or scheduled in time to permit a timely request for a
determination of dischargeability, Systems Administrators was prejudiced.  Therefore, the debt is
nondischargeable if it falls within one of the exceptions.

[10] Systems Administrators argues that regardless of the above discussion, the debt should
not be discharged because Mr. Thomassen's omission of it from his bankruptcy schedule was
intentional.  See In re Collis, 223 B.R. 814, 815 (Bankr. M.D. Fla. 1997) ("In a no-asset case, if
(continued...)

The only remaining question at this point, is whether this Court can determine the dischargeability of this debt or whether that determination must be made by the bankruptcy court.  Our research of the caselaw reveals that the question of whether the bankruptcy court has exclusive jurisdiction to determine whether a debt meets the definition under one of the § 523(a) exceptions is not settled.  Some courts hold that bankruptcy courts have exclusive jurisdiction to determine the nature of the debt.  E.g., In re Padilla, 84 B.R. 194, 197 (Bankr. D. Colo. 1987) (holding that "[o]nly the Bankruptcy Court" can determine whether the debt "is a §§ 523(a)(2), (4), or (6) debt or [whether] it is another type of debt").  Consequently, because the determination regarding the nature of the debt must be made before any court can determine whether § 523(a)(3)(B) applies, the court in Padilla held that the bankruptcy court has exclusive jurisdiction under § 523(a)(3)(B).  Id.

However, other courts disagree with this conclusion.  While there is agreement that the bankruptcy court does have exclusive jurisdiction to determine whether a debt is a §§ 523(a)(2), (4), or (6) debt, courts that disagree with the analysis in Padilla do so on the basis that it ignores the language in § 523(a)(3)(B) providing that a debt is excepted under

---

[10](...continued)
the Debtor's failure to schedule a known debt is for reasons of honest mistake *and not due to fraud or intentional design*, the debt is still dischargeable.") (emphasis added).  We do not find this analysis persuasive, however, because, as recognized by the Northern District of Illinois, "[n]othing in section 523(a)(3) refers to the debtor's state of mind.  Rather, the question is whether there are assets from which a dividend can be paid on timely proofs of claim."  In re Karras, 165 B.R. 636, 639 (N.D. Ill. 1994) (holding that "the argument that the Debtor should not be allowed to discharge his debt to them because he intentionally omitted the debt from the schedule, is . . . meritless.").

that provision as long as it is "of a kind" specified in §§ 523(a)(2), (4), or (6).  E.g., In re Keenon, 231 B.R. 116, 126 (Bankr. M.D. Ga. 1999).  Therefore, "trial on the underlying [section] 523(a)(2), (4), or (6) claim on its merits is not appropriate when determining a section 523(a)(3)(B) action; only a showing that a colorable or viable claim thereunder exists is all that should be required."  Id. (citing In re Haga, 131 B.R. 320, 327 (Bankr. W.D. Tex. 1991)).

Courts within the Seventh Circuit are also divided on this issue.  In the Eastern District of Wisconsin, the bankruptcy court held that "the price to the debtor of omitting a debt incurred through fraud [§ 523(a)(2)], embezzlement, larceny, breach of fiduciary duty [§ 523(a)(4)], or willful and malicious conduct [§ 523(a)(6)] is loss of exclusive federal jurisdiction and loss of the sixty-day limitation period.  Thereafter, the action may be brought, like most other dischargeability actions, at any time and either in a bankruptcy court or in a nonbankruptcy court."  In re Guseck, 310 B.R. 400, 404 (Bankr. E.D. Wis. 2004).  Similarly, the Northern District of Illinois has recognized that a creditor may choose either to move to reopen the case in bankruptcy court or to have the court in which the lawsuit was brought determine dischargeability.  In re Mendiola, 99 B.R. 864, 870 (Bankr. N.D. Ill. 1989) ("[I]f a creditor pursues a lawsuit on the claim, the debtor can assert the bankruptcy discharge as an affirmative defense and the court *with jurisdiction over that lawsuit can decide* whether the debt falls within any of the exceptions to discharge.  Second, under Bankruptcy Rule 4007(b) either the Debtor or the creditor can move to reopen this case for the purpose of filing a complaint to determine

dischargeability.") (emphasis added).  However, ruling on an appeal from the bankruptcy court's order denying the creditors' motion to allow filing of a complaint and objection to discharge, the Court in the Northern District of Indiana held that, "regardless of whether this court may have jurisdiction to determine the issue [of dischargeability] in a separate action, the court does not believe it proper to do so in its appellate role.  Because the issue of dischargeability under § 523(a)(3)(B) was not argued in the bankruptcy court, this court lacks a sufficient factual record to make such a determination."  American Standard Ins. Co. v. Bakehorn, 147 B.R. 480, 484 (N.D. Ind. 1992) (Miller, J.).

Despite the obvious lack of clarity in the precedents as to this issue, we view the case at hand to be most closely related to Mendiola.  In Mendiola, the court recognized that a bankruptcy discharge may be raised as an affirmative defense in a lawsuit between a creditor and a debtor, which is what Mr. Thomassen has done here.  In such a situation, the court in Mendiola ruled that the court with jurisdiction over the lawsuit is empowered to determine whether the debt falls under any of the § 523(a) exceptions.  We accept this approach as the better-reasoned view and therefore, shall proceed to determine the issue, mindful that the exceptions to discharge "are to be construed strictly against a creditor and in favor of the debtor."  In re Hostetter, 320 B.R. 674, 681 (Bankr. N.D. Ind. 2005).

### B.    Section 523(a) Exceptions

#### 1.    False Pretenses or Representations or Actual Fraud

The first exception to dischargeability recognized under § 523(a) identifies three

modes of conduct any one of which would justify the nondischargeability of a debt: false representation, false pretenses, and actual fraud. 11 U.S.C. § 523(a)(2)(A).  In order for a debt to fall within this first exception, the creditor must show by a preponderance of the evidence that: "(1) the debtor made a representation to the creditor; (2) at the time of the representation, the debtor knew it to be false or the representation was made with such reckless disregard for the truth as to constitute willful misrepresentation; (3) the debtor made the representation with the intent and purpose of deceiving the creditor; (4) the creditor relied on the representation resulting in a loss to the creditor; and (5) the creditor's reliance was justifiable." Hostetter, 320 B.R. at 681 (citations omitted).

While fraud is often equated with misrepresentation, the Seventh Circuit recognizes that misrepresentation is not the only type of fraud that can render a debt nondischargeable under § 523(a)(2)(A).  See McClellan v. Cantrell, 217 F.3d 890, 892 (7th Cir. 2000).  An omission of a material fact can also qualify under this exception.  In re Miller, 282 B.R. 569, 576 (Bankr. D. Conn. 2002) ("A party to a business transaction who fails to disclose to another party a fact that he knows may justifiably induce that party to refrain from entering into a business transaction is subject to the same liability as one who makes a 'false representation.'").  Additionally, the Seventh Circuit has held that § 523(a)(2)(A) extends beyond both misrepresentations and misleading omissions to encompass "'any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another.'" McClellan v. Cantrell, 217 F.3d at 893, quoted in In re Gard, 327 B.R. 372, 375 (Bankr. N.D. Ind. 2003).

25

However, this exception does not encompass constructive frauds; only actual frauds are capable of rendering a debt nondischargeable. 217 F.3d at 894. Therefore, a plaintiff must demonstrate an intent to deceive, either through direct evidence or by logically inferring intent from a false representation, as long as the debtor knew or should have known that it would induce the creditor to act. In re Monroe, 304 B.R. 349, 356 (Bankr. N.D. Ill. 2004). "[A] mere breach of contract by the debtor without more, does not imply existence of actual fraud for purposes of the exception to discharge under Section (a)(2)(A) . . . . A mere promise to be executed in the future, is not sufficient to make a debt non-dischargeable, even though there is no excuse for the subsequent breach. . . ." In re Fitzgerald, 109 B.R. 893, 897 (Bankr. N.D. Ind. 1989) (citations omitted). Thus, "[t]he mere fact that the promissee subsequently failed to make good on his promise has no probative value in establishing the necessary element of scienter . . . ." Hostetter, 320 B.R. at 683.

Here, Systems Administrators has been unable to prove that, at the time Mr. Thomassen received the payments from Systems Administrators, he knew that he did not have the capability to fulfill the contract and that he had no intention of completing the repairs on the aircraft. Systems Administrators alleged that Mr. Thomassen's representations regarding expected completion dates and his progress reports constituted constructive fraud. However, as we have previously noted, constructive fraud does not suffice in satisfying this exception to dischargeability. Systems Administrators failed to establish that Mr. Thomassen acted with fraudulent intent when he made those statements

26

to it.

Although Mr. Thomassen did not repair the aircraft in accordance with his contractual duty to do so, he did perform some work on the Cessna during the time it was in his possession.  Mr. Thomassen also testified regarding a number of problems he encountered during the repair process that slowed his progress, including medical issues within his family, unforeseen difficulties getting the parts from Gazelle, and additional repairs which were not originally apparent when Mr. Thomassen made his initial estimate.  While none of these events in any way excuses his failure to complete the repairs, they rebut the conclusion that Mr. Thomassen intended to defraud Systems Administrators when he made promises that the repairs would be accomplished by certain specified deadlines.  In short, Mr. Thomassen likely overestimated his ability to fulfill his contractual obligations, but the evidence did not establish that he acted with fraudulent intent.  Consequently, Systems Administrators has failed to establish that this debt satisfies the § 523(a)(2)(A) exception to dischargeability.

## 2.      Fraud or Defalcation in Fiduciary Capacity

The second exception, to wit, for fraud or defalcation while acting in fiduciary capacity, as defined in 11 U.S.C. § 523(a)(4), requires proof of either (1) fraud, which is a positive, intentional misrepresentation or falsehood; or (2) defalcation, which is broader than embezzlement and, in some cases, even broader than misappropriation which includes a fiduciary's failure to account for money received in his or her fiduciary

capacity.  In re Guy, 101 B.R. 961, 991 (Bankr. N.D. Ind. 1988).  There is no element of intent or bad faith associated with defalcation, so misrepresentation due to negligence or ignorance is usually enough.  Id.  However, this exception requires that the fraud or defalcation take place at a time when the debtor is acting as a fiduciary.  Therefore, to resolve this issue, the court undertakes a two-step analysis: the court must find, first, that a fiduciary relationship existed between the plaintiff and the debtor/defendant; and, second, that the debtor's obligation arose out of the fraud or defalcation while in the course of that fiduciary capacity.  In re Grotrian, 217 B.R. 1017, 1020 (Bankr. N.D. Ind. 1997).

In this context, "fiduciary capacity" is construed more narrowly than in other contexts, to apply "to technical or express trusts or to those imposed by statute, as opposed to those which arise out of equitable consideration or which are implied by law." Id. (citations omitted).  Thus, demonstrating that a fiduciary relationship exists for the purposes of this exception "requires an explicit declaration of trust, a clearly defined trust res, and an intent to create a trust."  In re Basel-Johnson, 366 B.R. 831, 847 (Bankr. N.D. Ill. 2007).  A key element in this context is "[t]he intent to create a trust relationship, rather than a contractual relationship . . . ."  In re Monroe, 304 B.R. 349, 358 (Bankr. N.D. Ill. 2004).  Consequently, "mere contract jargon is not determinative of the existence of a fiduciary relationship and the determinative causes are whether there was an effective duty to segregate funds, an insistence on segregation of funds, formality of relationship and requirement of an accounting."  In re Littell, 109 B.R. 874, 881 (Bankr. N.D. Ind.

1989).

Throughout trial, Systems Administrators never contended that an express trust had been created between it and Mr. Thomassen/Avionics Solutions, nor did the evidence presented demonstrate that the parties ever even discussed or intended that a trust be established. At no point did Mr. Thomassen expressly signify his intention, nor was he clearly put on notice by Systems Administrators, that he was undertaking the special responsibilities of a trustee to account for his actions. Additionally, Systems Administrators did not require Mr. Thomassen to segregate the payments it made for the contract repairs and keep them in a separate account. In short, Systems Administrators was not able to demonstrate that its relationship with Mr. Thomassen differed from an ordinary contract relationship. At most, the evidence pointed to the possibility that an implied trust due to wrongdoing might be imposed. However, an implied trust is not sufficient for a debt to be nondischargeable under this exception. In re White, 315 B.R. 741, 749 (Bankr. D. Neb. 2004) ("'Acting in a fiduciary capacity' is limited in application to technical or express trusts, not to trusts that may be imposed because of the alleged act of wrongdoing from which the underlying indebtedness arose.").

The Seventh Circuit has held that a fiduciary relationship as construed under § 523(a)(4) may, in some cases, arise apart from an express trust when there is "a difference in knowledge or power between fiduciary and principal which . . . gives the former a position of ascendancy over the latter." In re Marchiando, 13 F.3d 1111, 1116 (7th Cir. 1994); accord In re Frain, 230 F.3d 1014, 1017 (7th Cir. 2000). However, "the critical

factor is still that a 'fiduciary relationship' pre-existed the purported wrong."  In re

Whiters, 337 B.R. 326, 331 (Bankr. N.D. Ind. 2006).  According to well-established

Seventh Circuit precedent, dealings between lawyers and clients, directors and

shareholders, managing partners and limited partners, and adults and children are

examples of relationships that would qualify as fiduciary relationships in this context.

E.g., In re Frain, 230 F.3d at 1017.  But, "a joint venture between equals will not qualify

as a fiduciary relationship."  In re Marchiando, 13 F.3d at 1116.

The relationship between Systems Administrators and Mr. Thomassen is not of the

type that the Seventh Circuit has previously recognized as a fiduciary relationship.  Here,

neither party owed the other any kind of special duty equivalent to that which would be

expected of a fiduciary.  In fact, Mr. Thomassen did not hold any duties independent and

apart from the duties set forth in his contractual agreement with Systems Administrators.

Both parties entered into this contract at arm's length and as equals.  Thus, considering

the narrow interpretation of "fiduciary" in this statutory context, Systems Administrators

was unable to prove by a preponderance of the evidence that Mr. Thomassen was acting

as a fiduciary when he took the money to repair the airplane.[11]  Therefore, we find that the

exception to dischargeability defined under 11 U.S.C. § 523(a)(4) does not apply in this

---

[11] Our research of the caselaw produced only two cases that dealt with the issue of whether a debtor engaged in the purchase, sale, lease, or service of airplanes was a fiduciary for the purposes of this exception and neither court found that a fiduciary relationship existed. See In re Miller, 282 B.R. 569 (Bankr. D. Conn. 2002) (ruling on a motion for summary judgment); In re Duncan, 162 B.R. 905 (Bankr. M.D. Fla. 1993).

case.[12]

### 3.    Willful or Malicious Injury

Pursuant to 11 U.S.C. § 523(a)(6), the exception to discharge under the bankruptcy statutes for willful or malicious injury is limited to a deliberate or intentional injury, not simply a deliberate or intentional act that leads to injury.  In re Radcliffe, 372 B.R. 401, 419 (Bankr. N.D. Ind. 2007).  Thus, in order to come within this exception, the injury must be the intended act of the debtor, meaning that the creditor must establish, at least by circumstantial evidence, that the debtor "had a *subjective* state of mind to commit injury to a property interest of the creditor."  Id.; accord In re Fowers, 360 B.R. 888, 900 (Bankr. N.D. Ind. 2007).  The creditor also must show malice on the part of the debtor, which requires "conscious disregard of one's duties with or without just cause or excuse." Fowers, 360 B.R. at 900 (quoting In re Thirtyacre, 36 F.3d 697, 700 (7th Cir. 1994)).

Conversion of a creditor's property may fall under this exception only if the debtor's conduct is malicious and willful.  In re Terranova, 301 B.R. 509 (Bankr. N.D. Ill. 2003).  Conversion arising from reckless or negligent acts is not excepted from discharge. In re Moir, 291 B.R. 887 (Bankr. S.D. Ga. 2003).  Consequently, in order for the debt to be nondischargeable under a conversion theory, the plaintiff must prove that the defendant either intended to exert unauthorized control over the plaintiff's property or

---

[12] This exception also applies if the debt arose from an act of embezzlement or larceny, but these offenses are not at issue in this case.

was substantially certain he or she was doing so.  In re Devore, 282 B.R. at 645.  Thus, "while they do appreciably overlap, liability for conversion does not automatically equate with the existence of a nondischargeable debt under § 523(a)(6)."  In re Little, 335 B.R. 376, 386 (Bankr. N.D. Ohio 2005) (quoting In re Martin, 321 B.R. 437, 441 (Bankr. N.D. Ohio 2004)); accord In re May, 2006 WL 2927582, at *2 (Bankr. S.D. Ind. 2006).

Tortious conversion in Indiana "consists either in the appropriation of the personal property of another to the party's own use and benefit, or in its destruction, or in exercising dominion over it, in exclusion and defiance of the rights of the owner or lawful possessor, or in withholding it from his possession, under a claim and title inconsistent with the owner's."  Computers Unlimited, Inc. v. Midwest Data Systems, Inc., 657 N.E.2d 165, 171 (Ind. Ct. App. 1995).  Mens rea is not an element of tortious conversion; therefore, tortious conversion does not constitute a willful and malicious injury.  Thus, in order to demonstrate that a debt is nondischargeable under § 523(a)(6) because of conversion, a creditor must prove that a debtor committed criminal conversion, not merely tortious conversion.  Under Indiana law, "[a] person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion."  Id. at 170.  An individual "engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so."  IND. CODE 35-41-2-2(b).  Control is "unauthorized" if it is exerted without the other person's consent, in a manner or to an extent other than that to which the other person has consented, or by promising performance that the person knows will not be performed.

32

See Ind. Code 35-43-4-1(b)(1), (2), and (6).

Here, Systems Administrators has alleged two instances of conversion. First, it claims that Mr. Thomassen converted the Cessna when he allowed an attorney to make representations that the aircraft would not be returned until the repairs were completed and that the police would be called to prevent Systems Administrators from trying to take possession of the Cessna before storage fees were paid. We do not find this theory persuasive. Initially, we are not convinced that the attorney's behavior can or should be imputed to Mr. Thomassen as it is unclear in what capacity the attorney was acting at the time and whether he had any authority to take the action he did. Regardless, however, it is clear that there was no conversion. The exchange took place at a time when there was a dispute between the parties regarding whether storage fees had to be paid before Systems Administrators could re-take possession of the Cessna, so, at that point, Mr. Thomassen believed that he had at least some rights with regard to the plane. Clearly, the repairs necessary to make the Cessna mobile had not been completed by Mr. Thomassen, making it doubtful that it could even be removed from the hangar to be delivered to Systems Administrators. Even so, despite the attorney's representations, Systems Administrators apparently was never denied access to the aircraft. In fact, the evidence established that Systems Administrators entered into a lease agreement to rent the hangar where the Cessna was stored on September 28, 2005, with the company from whom Mr. Thomassen had been renting. Mr. Thomassen was not involved in that transaction and made no objection to Systems Administrators taking possession of the hangar. In short,

Systems Administrators failed to prove that Mr. Thomassen ever intended to exert unauthorized control over the Cessna.

Systems Administrators also argues that Mr. Thomassen committed conversion of its personal property by taking the money Systems Administrators paid him to repair the Cessna and then using it for his own purposes, rather than applying it to complete the repairs. Money may be the subject of an action for conversion, as long as it is "a determinate sum with which the defendant was entrusted to apply to a certain purpose." Tobin v. Ruman, 819 N.E.2d 78, 89 (Ind. Ct. App. 2004) (quoting Huff v. Biomet, Inc., 654 N.E.2d 830, 836 (Ind. Ct. App. 1995)). Here, we are unable to find anything in the agreement to suggest that Mr. Thomassen was under any obligation to use *the specific* $47,823.35 which Systems Administrators paid him to complete the repairs. There was no escrow account established and no arrangements made to deliver the money to a third party for safekeeping, nor did Systems Administrators send checks specifically itemized for certain expenses. See Kopis v. Savage, 498 N.E.2d 1266, 1270 (Ind. Ct. App. 1986). In the absence of some indication that Systems Administrators's funds were supposed to be kept separate from other funds, we cannot find that a criminal conversion occurred. Mr. Thomassen simply failed to fulfill his contractual obligations, and, "under 11 U.S.C. § 523(a)(6) the mere failure to abide by contractual obligations is *not* sufficient to sustain an exception to discharge." Whiters, 337 B.R. at 339. Because Systems Administrators has been unable to prove that Mr. Thomassen's committed conversion with respect to either the plane itself or the payments made for the repairs, we find that the debt is not

excepted from discharge under § 523(a)(6).

## IV.    Counterclaim for Storage Fees

Mr. Thomassen brought a counterclaim against Systems Administrators alleging

that he is owed storage fees in the amount of $13,795.00 for the period during which he

housed the Cessna in his rented hangar.  Mr. Thomassen's initial communications with

Systems Administrators all indicate that Systems Administrators would not be charged

storage fees so long as Mr. Thomassen was retained to complete the repairs on the

aircraft.  However, in Mr. Thomassen's letter to Systems Administrators dated January

11, 2004, he discusses for the first time storage fee figures which he represented would be

effective January 15, 2004.  Mr. Thomassen also cites an e-mail communication to him

from Ms. Blanchard in which she listed $85.00 per day in storage fees through June as an

expense to be reported to the attorneys handling the lawsuit with Gazelle.  However, Ms.

Blanchard testified that she understood her communications with Mr. Thomassen

regarding storage fees to be solely related to Systems Administrators's lawsuit against

Gazelle, not to any agreement it had with Mr. Thomassen.

Ms. Blanchard's contention is bolstered by Mr. Thomassen's own behavior

throughout his extended dealings with Systems Administrators.  Mr. Thomassen never

acted in a manner that would demonstrate that he believed Systems Administrators owed

him fees for storage.  He never provided Systems Administrators with an invoice, nor did

he make any demands for payment throughout the nearly three years he had possession of

the Cessna.  It was only when Systems Administrators finally demanded that the aircraft

be released from his possession in September 2005 that there were any representations by

Mr. Thomassen that storage fees had to be paid before the Cessna would be returned.  Mr.

Thomassen thus has failed to prove by a preponderance of the evidence that these fees

were part of the contract or that Systems Administrators was required to pay them as a

result of some other agreement.  Accordingly, we hold that Systems Administrators is

<u>NOT</u> <u>LIABLE</u> for storage fees.


**V.      Conclusion**

        For all the reasons detailed above, we conclude that Avionics Solutions is <u>LIABLE</u>

to Systems Administrators in the amount of $47,823.35.  Additionally, because Mr.

Thomassen failed to observe corporate formalities and maintain separation between his

corporate and personal affairs, the Court was justified in piercing the corporate veil.

Thus, Mr. Thomassen is determined to be personally <u>LIABLE</u> for his corporation's debts

in the amount of $47,823.35.  However, because Mr. Thomassen filed an intervening

Chapter 7, no-asset bankruptcy proceeding, though the debt was not specifically included

in the bankruptcy petition, because it does not satisfy any of the exceptions to discharge

provided for in 11 U.S.C. § 523(a), we find that it has been discharged and Mr.

Thomassen has no obligation to pay that debt or any damages relating thereto based on

his breach of contract with Systems Administrators.  Finally, with regard to Mr.

Thomassen's counterclaim for storage fees, Systems Administrators is <u>NOT</u> <u>LIABLE</u>.  IT

IS SO ORDERED.


Date:   01/10/2008

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Mark S. Alderfer
HACKMAN HULETT & CRACRAFT LLP
malderfer@hhclaw.com

David J. Bodle
HACKMAN HULETT & CRACRAFT LLP
dbodle@hhclaw.com

Vincent S. Taylor
vstaylor@hughes.net